Johnston v. Johnston Props., Inc., 2018 NCBC 118.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 4784

ROBERT N. JOHNSTON,

      Plaintiff,

v.

JOHNSTON PROPERTIES, INC;
KAREN LANG JOHNSTON, as
the personal representative of the
ESTATE OF W. EUGENE
JOHNSTON, III; and EDWARD N.
GIDEON,

      Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
AND FOR JUDGMENT ON THE
PLEADINGS**

1.    **THIS MATTER** is before the Court on the Motion to Dismiss and for Judgment on the Pleadings (the "Motion") filed by Defendants Johnston Properties, Inc. ("Johnston Properties"); Karen Lang Johnston, as the personal representative of the Estate of W. Eugene Johnston, III (the "Estate"); and Edward N. Gideon ("Gideon") (collectively, "Defendants") on June 28, 2018. (ECF No. 18.) The Motion seeks dismissal of the first six claims against all Defendants pursuant to Rules 12(b)(6) and Rule 12(c) and for all claims against Gideon for lack of standing. For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** the Motion.

    *Nexsen Pruet, PLLC, by Gary L. Beaver, for Plaintiff.*

    *Connors Morgan, PLLC, by C. Scott Meyers, for Defendants.*

Robinson, Judge.

## I. INTRODUCTION

2.    This litigation arises out of a minority shareholder's demand for dividends and the corporation's decision not to pay dividends and to instead offer to redeem the demanding shareholder's shares.  Johnston Properties is a closely-held corporation with three shareholders.  From 2017 until March 28, 2018, the majority shareholder of Johnston Properties was W. Eugene Johnston ("Gene Johnston"), one of the founders of the corporation.  Upon his death in March 2018, the Estate became the majority shareholder.

3.    The minority shareholders are Gideon and Plaintiff.  Gideon is currently the director and chief executive officer of the corporation.  Plaintiff served as president of the corporation from 2001 to 2017.  In February of 2018, Plaintiff sent a demand for dividends to Johnston Properties.  Thereafter, Johnston Properties exercised its statutory right under section 55-6-40(j) of the North Carolina General Statutes to redeem all shares held by Plaintiff in lieu of a dividend payment.

4.    Plaintiff alleges that he had a right to receive a dividend because of the cash assets of the corporation, and that the redemption offer was not based on the fair value of Plaintiff's shares as required by section 55-6-40(j).  Plaintiff alleges that the majority shareholder, the Estate, and the other minority shareholder and current director of the corporation, Gideon, acted in concert to force Plaintiff to redeem his shares for less than fair value.  Defendants seek dismissal pursuant to both Rule 12(b)(6) and Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rule(s)").

## II. PROCEDURAL HISTORY

5. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

6. Plaintiff initiated this action by filing the Complaint on April 23, 2018. (ECF No. 3.) Plaintiff then sought designation of this action as a mandatory complex business case, (ECF No. 4), and by order on April 24, 2018, the case was so designated by Chief Justice Mark Martin of the Supreme Court of North Carolina, (ECF No. 1). On the same date, the case was assigned to the undersigned by order of then-Chief (now Senior) Business Court Judge James L. Gale. (ECF No. 2.)

7. On June 14, 2018, Plaintiff filed his Amended Complaint. (ECF No. 14.) The Amended Complaint asserts seven claims in total. (First Am. Compl. ¶¶ 68–100 ["Compl."].) Plaintiff asserts claims against all Defendants for failure to act in good faith in refusing to pay dividends (Claim IV), and for unfair or deceptive trade practices ("UDTP") (Claim VI), (Compl. ¶¶ 83, 95). Plaintiff further asserts a claim against the Estate and Gideon for breach of fiduciary duty (Claim V), (Compl. ¶ 90). Plaintiff additionally asserts a claim against Johnston Properties and Gideon for failure to comply with shareholder rights to inspect and copy corporate records (Claim VII), (Compl. ¶ 100). Lastly, Plaintiff seeks dissolution of Johnston Properties (Claim I) and appointment of a receiver (Claims II and III), (Compl. ¶¶ 69, 72, 75).

8. On June 28, 2018, Defendants filed their Answer and Counterclaim. (ECF No. 17.) Two minutes later, Defendants filed the Motion, (ECF No. 18), seeking dismissal pursuant to Rules 12(b)(6) and 12(c) of all of Plaintiff's claims except for

Plaintiff's Seventh claim for failure to comply with shareholder rights to inspect and copy corporate records. (Defs.' Mot. to Dismiss & J. Pleadings 1, ECF No. 18 ["Mot."].) The Motion also seeks dismissal on all claims against Gideon for lack of standing. (Mot. 1.) Plaintiff filed his Reply to Counterclaim on July 31, 2018. (ECF No. 27.)

9. The Motion has been fully briefed and the Court held a hearing on the Motion on September 24, 2018 at which all parties were represented by counsel.

10. The Motion is ripe for resolution.

## III. FACTUAL BACKGROUND

11. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) or on a motion for judgment on the pleadings under Rule 12(c) but recites only those factual allegations that are relevant and necessary to the Court's determination of the Motion.

### A. The Parties and the Corporation's Background

12. Johnston Properties, originally incorporated as Guilford Galleries in 1970, is a North Carolina corporation with its principal place of business in Guilford County, North Carolina. (Compl. ¶¶ 2, 9; Answer, Affirmative Defs., & Countercl. ¶¶ 2, 9, ECF No. 17 ["Answer"].) Johnston Properties is primarily engaged in the business of commercial real estate ownership and leasing. (Compl. ¶ 3; Answer ¶ 3.) Currently, there are two directors of the corporation: Gideon and Odell Payne. (Compl. ¶ 54; Answer ¶ 54.)

13. Gene Johnston incorporated Johnston Properties and was its sole shareholder until 1986. (Compl. ¶¶ 9, 12; Answer ¶¶ 9, 12.) Starting in 1986, Gene

Johnston began gifting stock in the corporation to his three children, one of whom is Plaintiff. (Compl. ¶ 12; Answer ¶ 12.) From November 2017 until his death on March 28, 2018, Gene Johnston was the majority shareholder of Johnston Properties. (Compl. ¶¶ 4–5; Answer ¶¶ 4–5.) Currently the Estate, with Karen Lang Johnston as executrix, is the majority shareholder. (Comp. ¶ 5; Answer ¶ 5.) Prior to his death, Gene Johnston "maintained effective control over the decisions of the board of directors," and after his death, the Estate continues to have such control. (Compl. ¶¶ 77–78.)

14. Plaintiff is a minority shareholder in Johnston Properties. (Compl. ¶ 29.) In February 1996, Plaintiff left his job in New York to move to North Carolina to work with Johnston Properties. (Compl. ¶ 13; Answer ¶ 13.) In 2001, Plaintiff was appointed President of Johnston Properties and served in that role until March 6, 2017. (Compl. ¶ 14; Answer ¶ 14.) Thereafter, Plaintiff remained an employee of Johnston Properties until June 10, 2017. (Compl. ¶ 21; Answer ¶ 21.) Throughout his employment, Plaintiff was a guarantor of Johnston Properties' debt, and at the time he was terminated from employment at Johnston Properties, he was the sole guarantor of between $7 million and $9 million of Johnston Properties' indebtedness. (Compl. ¶ 27.) As of November 2017, Plaintiff owned 1,237 shares, or 43.01% of the total outstanding shares, of Johnston Properties. (Compl. ¶ 29; Answer ¶ 29.)

15. Gideon is a director and the chief executive officer of Johnston Properties. (Compl. ¶ 6; Answer ¶ 6.) Gideon currently owns 1.5% of the stock in Johnston Properties, which was given to Gideon as a "bonus" for managing and selling

Johnston Properties' real estate assets. (Compl. ¶ 31; Answer ¶ 31.) On or about December 16, 2016, Gene Johnston directed Plaintiff to give Gideon his proxy to vote his stock, which Plaintiff provided to Gideon. (Compl. ¶ 15; Answer ¶ 15.) After Gene Johnston's death, the Estate delegated control and authority over the operations and decisions of the corporation to Gideon. (Compl. ¶ 78; Answer ¶ 78.)

16.    From 1986 until June 2017, the four shareholders of Johnston Properties were the three Johnston siblings and Gene Johnston. (Compl. ¶¶ 12, 24.) Currently, the three shareholders of Johnston Properties are Gideon, Plaintiff, and the Estate. (Compl. ¶¶ 29, 31; Answer ¶ 29, 31.)

B.    Plaintiff's Valuation

17.    In mid-December 2017, Plaintiff developed a written valuation of Johnston Properties (the "Valuation"). (Compl. ¶ 17; Answer ¶ 17.) In January 2018, Plaintiff presented the Valuation to Gideon. (Compl. ¶ 19.) Gideon instructed Plaintiff not to share the Valuation with the other two Johnston siblings because Gideon believed the Valuation was "too high." (Compl. ¶ 19.) When Plaintiff refused to lower the Valuation because it would be "unfair," Gideon "threatened" Plaintiff to "get on board with us or you're fired." (Compl. ¶ 19.)

18.    On June 7, 2017, the four shareholders of Johnston Properties—the three Johnston siblings and Gene Johnston—participated in a mediation to resolve a dispute between them. (Compl. ¶ 24; Answer ¶ 24.) The mediation resulted in an agreement whereby Plaintiff's two siblings' shares were redeemed at a value "well below" the value reflected in Plaintiff's Valuation. (Compl. ¶ 24.) These stock

redemption payments resulted in a "significant increase in the value of the stock owned by the remaining two shareholders[,]" who were Plaintiff and Gene Johnston. (Compl. ¶ 35.)

### C. Plaintiff's Demand for Dividends

19. For the fiscal year ending January 31, 2018, Johnston Properties had a year-end cash balance of $5,270,377. (Compl. ¶ 33.) Johnston Properties has paid dividends to its shareholders on four separate occasions in the last fourteen years: in 2004, 2013, 2014, and 2016. (Compl. ¶ 32; Answer ¶ 32.) For Johnston Properties' fiscal year ending January 31, 2018, it had a year-end cash balance of "millions more" than it had in past years where it had issued dividends to its shareholders. (Compl. ¶ 33.) No dividends were paid to shareholders in 2018. (Compl. ¶¶ 80−81.)

20. On December 18, 2017, Johnston Properties sent a letter to Plaintiff to negotiate a "buy-back" of Plaintiff's shares (the "December 2017 Letter"). (Compl. ¶ 34; Answer ¶ 34.) The December 2017 Letter stated that the board of directors, who at the time were Gene Johnston, Gideon, and Odell Payne, (Compl. ¶ 28; Answer ¶ 28), was "focused on moving the company in a new direction." (Compl. ¶ 36; Answer ¶ 36.) The December 2017 Letter also stated that the corporation "anticipated issuing additional shares of stock," which, if issued, would reduce Plaintiff's ownership in the corporation. (Compl. ¶ 37; Answer ¶ 37.) Plaintiff contends that this representation in the December 2017 Letter was "an effort to bully and oppress [Plaintiff] to agree to a sale of his stock for a price below fair value." (Compl. ¶ 37.)

21.     On December 29, 2017, Plaintiff, through his attorney William Wilcox, sent Johnston Properties a letter indicating he would be open to an offer to either sell his shares or buy Gene Johnston's shares.  (Compl. ¶ 38; Answer ¶ 38.)  Johnston Properties did not respond to Plaintiff's letter.  (Compl. ¶ 39.)

22.     On February 1, 2018, Plaintiff, through his attorney, sent a letter making a demand for payment of dividends (the "Demand Letter").  (Compl. ¶ 39; Answer ¶ 39.)  The Demand Letter also requested to inspect and copy Johnston Properties' corporate records.  (Compl. ¶ 39; Answer ¶ 39.)

23.     On February 19, 2018, Plaintiff and his accountant received a "limited number" of Johnston Properties' corporate records.  (Compl. ¶ 40.)  Gideon did not allow Plaintiff to copy any records, nor did he give Plaintiff access to most of the records Plaintiff requested.  (Compl. ¶ 40.)  On February 22, 2018, Plaintiff made a second demand for access to and copies of the requested records, to which Johnston Properties had, as of the date of the filing of the Amended Complaint, failed to respond to.  (Compl. ¶ 41.)

24.     On March 28, 2018, Johnston Properties sent Plaintiff a letter rejecting his demand for dividends and instead electing to redeem Plaintiff's stock pursuant to section 55-6-40(j) of the North Carolina General Statutes (the "First Redemption Offer").  (Compl. ¶ 42; Answer ¶ 42.)  The First Redemption Offer, which was based on an appraisal obtained from Dwight A. Ensley (the "Ensley Appraisal"), valued Johnston Properties at $15,121,021 and valued Plaintiff's 43.01% ownership interest at $3,902,400.  (Compl. ¶ 45; Answer ¶ 45.)  Plaintiff alleges there were several

inaccuracies with the Ensley Appraisal. (Compl. ¶ 45.) The First Redemption Offer also stated that Johnston Properties intended to offset the $3,902,400 value of Plaintiff's shares by nearly $1.4 million for Plaintiff's alleged mismanagement, all of which occurred before December 16, 2016. (Compl. ¶¶ 46–47.)

25. On April 6, 2018, Plaintiff withdrew his demand for dividends. (Compl. ¶ 51; Answer ¶ 51.) On April 12, 2018, Plaintiff received another letter with an offer to redeem Plaintiff's stock (the "Second Redemption Offer"). (Compl. ¶ 52; Answer ¶ 52.) The Second Redemption Offer proposed either $1.6 million in cash, or $1.2 million from the proceeds of a pending sale of property, when received, plus a ten-year promissory note for $1.2 million with interest accruing at 3% per annum, payable in quarterly installments. (Compl. ¶ 52.) Like the first offer, the Second Redemption Offer was below the fair value of Plaintiff's shares in Johnston Properties. (Compl. ¶ 52.) The Second Redemption Offer also stated that Johnston Properties' directors were going to offer additional stock shares for sale to the "current directors of the company" and possibly to "other related individuals." (Compl. ¶ 52; Answer ¶ 52.) Issuance of additional shares would thereby reduce Plaintiff's percentage ownership interest in Johnston Properties. (Compl. ¶ 52.)

26. Plaintiff alleges that Defendants' failure to issue dividends despite cash availability to pay such dividends, and stock redemption offers worth significantly less than the value of his shares, show Defendants' failure to act in good faith in protecting his shareholder interests. (Compl. ¶ 81.)

D. Alleged Mismanagement of Johnston Properties

27. The Amended Complaint alleges that Gideon, as director and chief executive officer of Johnston Properties, has mismanaged, and will continue to mismanage, Johnston Properties. (Compl. ¶¶ 56–64.) Gideon had no experience in real estate prior to his position at Johnston Properties. (Compl. ¶ 56; Answer ¶ 56.) Yet, the Estate delegated control and authority over the operations and decisions of the corporation to Gideon. (Compl. ¶ 78; Answer ¶ 78.) Therefore, Plaintiff alleges that Gideon lacks the background to manage the corporation's assets. (Compl. ¶ 62.) Moreover, since becoming a director and chief executive officer of Johnston Properties, Gideon has sold a majority of Johnston Properties' real estate holdings "without trying to reduce [its] tax exposure, thereby depleting the assets of [Johnston Properties]." (Compl. ¶ 59.) Gideon has neither notified Plaintiff of these sales nor provided Plaintiff with an accounting of these sales. (Compl. ¶ 60.)

28. Johnston Properties has only one employee. (Compl. ¶ 58.) This employee's principal duties are to repair and manage property owned by Karen Lang Johnston, the widow of Gene Johnston and the executrix of the Estate. (Compl. ¶ 58.)

29. As a result of Gideon's mismanagement of the corporation and the continued payments to both Gideon and the corporation's sole employee, Johnston Properties' remaining cash "will be improperly depleted" if Gideon is left in control of the corporation. (Compl. ¶ 63.)

## IV. LEGAL STANDARD

30. The Court notes that Defendants have moved to dismiss pursuant to both Rules 12(b)(6) and 12(c). As noted above, and though he does not cite Rule 12(b)(1) as a basis for his request, Gideon also contends that claims raised against him are subject to dismissal because Plaintiff lacks standing to raise them.

31. To the extent that Defendants have moved to dismiss pursuant to Rule 12(b)(6), the Court finds that the Motion is untimely. Rule 12(b) is clear that a motion asserting such a defense "shall be made *before* pleading if a further pleading is permitted." N.C. Gen. Stat. § 1A-1, Rule 12(b) (emphasis added). Therefore, under the express language of Rule 12(b), a motion to dismiss for failure to state a claim must be made before filing a responsive pleading. This Court has held that in the absence of case law from appellate courts interpreting such language to mean otherwise, a Rule 12(b) motion to dismiss for failure to state a claim must be filed *prior to* an answer, not contemporaneously with or minutes after. *See New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *24 (N.C. Super. Ct. Aug. 18, 2017).

32. Here, Defendants filed their answer to the Amended Complaint on June 28, 2018 at 12:54 P.M. Two minutes later, Defendants filed the Motion at 12:56 P.M. While Defendants filed the Motion mere minutes after filing its answer, this Court's holding in *New Friendship* is clear: a motion to dismiss for failure to state a claim must be filed prior to an answer. As such, Defendants' Motion, to the extent it seeks dismissal on Rule 12(b)(6) grounds, is untimely.

33.     Nonetheless, this Court also concluded in *New Friendship* that under Rules 12(b) and 12(h)(2), a post-answer Rule 12(b)(6) motion may be considered as a Rule 12(c) motion for judgment on the pleadings. *Id.* at *25−26. Accordingly, the Court now addresses whether or not to consider the Motion on 12(c) grounds.

34.     Defendants cite repeatedly throughout the Motion and the accompanying brief to the 12(c) standard of review. Yet the Court finds that the Motion, to the extent it sought dismissal pursuant to Rule 12(c), was premature. Pleadings had not closed at the time the Motion was filed. Defendants filed their Answer and Counterclaim on June 28, 2018. Pursuant to Rules 7.6 and 3.9(d) of the General Rules of Practice and Procedure for the North Carolina Business Court, Plaintiff's reply to the Counterclaim was due on July 31, 2018. Though, as noted above, the Motion was filed on the same day as the Counterclaim, before a reply had been filed and the pleadings had closed. Consistent with this Court's opinion in *New Friendship*, therefore, the Motion should be denied without prejudice for Defendants to refile.

35.     However, the Court heard argument on the Motion on September 24, 2018. There, the Court indicated that *New Friendship* permitted dismissal of the Motion, but that, unlike *New Friendship*, by the time the Court considered the Motion, pleadings had concluded. Plaintiff timely filed its Reply to the Counterclaim on July 31, 2018, nearly two months before the hearing. At the hearing, the Court asked Plaintiff if reliance on its Reply to the Counterclaim was necessary to oppose Defendant's Motion. Plaintiff indicated it was not. The Court then clarified that if it were to decide the Motion, rather than dismiss it without prejudice for Defendants to

refile, it would consider only the Amended Complaint, Answer, and affidavits affixed thereto. While Plaintiff did not waive his objection to the Motion as premature, Plaintiff represented that there was nothing in his Reply that was different, or in addition to, those allegations maintained in the Amended Complaint. Accordingly, the Court, in its discretion, concludes that Defendant's Motion may be considered as a Rule 12(c) motion for judgment on the pleadings, considering only those factual allegations contained in the Amended Complaint and Answer.

36.    "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008). On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of fact exists and that he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J.F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).

37. "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

## V.    ANALYSIS

38. The Motion represents that Plaintiff's Fourth, Fifth, and Sixth claims all arise out of Defendants' refusal to pay dividends, but that Plaintiff failed to allege that he had either a right to receive, or a reasonable expectation to receive, a dividend. (Br. Supp. Mot. Dismiss 7, ECF No. 19 ["Br. Supp."].) Defendants argue that Johnston Properties acted within its statutory rights to counter Plaintiff's dividend demand with an offer to purchase Plaintiff's shares in Johnston Properties, and therefore Plaintiff has no right to a dividend. (Br. Supp. 9.) Accordingly, Defendants argue that because Plaintiff's Fourth, Fifth, and Sixth claims all arise out of his expectation to receive a dividend, and because Plaintiff failed to allege such an expectation, these three claims fail as a matter of law. (Br. Supp. 7.) Additionally, the Motion contends that Plaintiff's Sixth (UDTP) claim fails as a matter of law for

the added reason that the dispute is a purely intracompany dispute. (Br. Supp. 12–13.) The Motion further argues that Plaintiff's first three claims, seeking dissolution and appointment of a receiver, fail to assert any allegations that would entitle Plaintiff to the relief requested, and thus, should be dismissed. (Br. Supp. 13–15.) Lastly, the Motion asserts that Plaintiff lacks standing to bring claims against Gideon directly, and therefore those claims should be dismissed. (Br. Supp. 7.) The Court analyzes the Motion, and Plaintiff's corresponding claims, in the order argued by Defendants in their briefing.

A.    Failure to Act in Good Faith (Claim IV)

39.    Plaintiff's Fourth claim alleges that Defendants failed to act in good faith by refusing to pay dividends. (Compl. ¶¶ 76–83.) Plaintiff represents that he had a "reasonable expectation of receiving a large dividend" because of Johnston Properties' substantial cash assets. (Compl. ¶ 80.) Plaintiff further contends that Defendants oppressed him as a minority shareholder by using his dividend demand as a way to force Plaintiff to sell his shares for an unfair value. (Compl. ¶ 81.) This conduct, Plaintiff argues, indicates Defendants' failure to exercise good faith, care, and diligence to protect Plaintiff's interests as a minority shareholder, and as a result, Plaintiff represents that he is entitled to have the Court order Johnston Properties to pay him a reasonable dividend. (Compl. ¶ 81.)

40.    Defendants seek dismissal of Plaintiff's Fourth claim alleging that Plaintiff failed to meet all the elements of a *Meiselman* claim. (Br. Supp. 9–10.) Defendants argue that Plaintiff did not allege any company policy or bylaw provision at Johnston

Properties that required the company to pay its shareholders dividends, but rather Plaintiff's only support for his "expectation of receiving a large dividend" was Johnston Properties' alleged payment of dividends in 2004, 2013, 2014, and 2016. (Br. Supp. 9.) Moreover, Defendants argue that because N.C. Gen. Stat. § 55-6-40(j) gives Johnston Properties the option to redeem Plaintiff's shares upon his written demand for a dividend, Plaintiff has no right to actually receive a dividend. (Br. Supp. 9.) Defendants contend that Plaintiff's failure to assert any right to receive a dividend is fatal to his claims. (Br. Supp. 8.)

41. The gravamen of Plaintiff's Amended Complaint is that he had a reasonable expectation of receiving a dividend payment, and that his failure to receive a dividend was the result of Defendants' oppressive conduct to force him to sell his ownership in the corporation. Thus, the Court must determine whether Plaintiff has satisfied his burden, for Rule 12(c) purposes, of alleging a right to, or reasonable expectation of receiving, a dividend from Johnston Properties.

42. Section 55-6-40 of the North Carolina General Statutes governs distributions to shareholders. N.C. Gen. Stat. § 55-6-40. Pursuant to section 55-6-40(i), a minority shareholder in a corporation with fewer than 25 shareholders may make a written demand for the payment of dividends. In response to a dividend demand, pursuant to section 55-6-40(j), the corporation may elect to redeem the demanding shareholder's shares in lieu of the payment of dividends. Section 55-6-40(j)(2) then provides that, if the shareholder and the corporation do not agree on the fair value of the shares, the shareholder may file a petition in superior court asking

for an appraisal. Section 55-6-40(i) and (j), therefore, provide a clear process by which a minority shareholder such as Plaintiff can proceed under these facts. Moreover, section 55-6-40(i) affords a shareholder a right to make a *demand* for dividends, but no right to *receive* a dividend, given the corporation's rights under section 55-6-40(j).

43.     Nonetheless, section 55-6-40(k) provides that, "[n]othing in this section shall impair any rights which a shareholder may have on general principles of equity to compel the payment of dividends." Our Supreme Court has held that oppressed minority shareholders have the aid of equity for adequate protection of their shareholder interests. *See Gaines v. Long Mfg. Co. (Gaines I)*, 234 N.C. 331, 338, 67 S.E.2d 355, 360 (1951). In *Gaines I*, the Court declared that,

> [t]he controlling corporate authorities will not be permitted to use their powers arbitrarily or oppressively by refusing to declare a dividend where net profits and the character of the business clearly warrant it. Accordingly, if it be made to appear that the controlling management is acting in bad faith, for their own gain and advantage, in oppressive disregard for the rights of minority stockholders . . . a court of equity may be invoked to break the shackles of any such oppressive control.

*Id.* at 337, 67 S.E.2d at 360.

44.     The Supreme Court's decision in *Gaines I* offers Plaintiff an opportunity to seek recourse above and beyond the process laid out in section 55-6-40(i)−(j), a statutory right to dividend payments that did not exist at the time *Gaines I* was decided. It allows a court to intervene when a minority shareholder, despite his efforts to go through internal corporate processes, is left without what is due to him. This avenue of recourse is similar to that expressed by our Supreme Court in *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983). *Meiselman* provides

that a minority shareholder in a close corporation can bring a claim against majority shareholders if the minority shareholder's reasonable expectations are thwarted. *Id.* at 298, 307 S.E.2d at 562. In order to prevail on a *Meiselman* claim, the minority shareholder must show that he has "one or more substantial reasonable expectations" to receive what he is complaining of. This Court has subsequently interpreted the relationship between *Gaines I* and *Meiselman* as follows:

> *Gaines* stands for the proposition that the courts may intervene only if directors are acting in bad faith and in an arbitrary or oppressive disregard of a minority shareholder's right. The standard for dividends in *Gaines* thus appears to be different from the *Meiselman* standard. The former uses bad faith and oppression, the latter rights and interests.

*High Point Bank & Tr. Co. v. Sapona Mfg. Co.,* 2010 NCBC LEXIS 14, at *23–24 (N.C. Super. Ct. June 22, 2010).

45. In *High Point Bank & Trust Co.*, finding that the defendant corporations fell outside section 55-6-40(i) because they had more than 25 shareholders, this Court nonetheless interpreted *Gaines I* to provide an opportunity for the plaintiff bank to seek to compel dividends if they were being wrongfully withheld. *Id.* at *24. Therefore, even where a minority shareholder does not have a *right* to compel a dividend, either statutorily or contractually, he may nonetheless have an opportunity to seek an equitable remedy under *Gaines I.*

46. In the instant case, Plaintiff alleges that Johnston Properties' substantial cash assets warrant his payment of a dividend. Plaintiff alleges that in previous years where the corporation's assets were similarly high, dividends have been paid to its shareholders. Yet, now that the corporation has more cash on hand than it ever

had before, Defendants refuse to pay any dividends. Plaintiff alleges the reason he has not been paid a dividend was part of a scheme to oppress him and force him to sell his shares. The Amended Complaint is rife with allegations of animosity amongst Plaintiff, the other shareholders, and the directors of the corporation. (Compl. ¶¶ 18, 19, 22, 26, 79, 81.) Plaintiff argues as a result of this scheme of oppression against him, Defendants stand to profit: the Estate, as majority shareholder, receives a windfall if Plaintiff is forced to sell his shares as the only alternative to his dividend demand, (Compl. ¶ 81), and Gideon, as the only other shareholder, will receive a greater ownership percentage in Johnston Properties if Plaintiff is ousted from the corporation, (Compl. ¶ 48).

47. These allegations of oppressive disregard for Plaintiff's shareholder interests are exactly what our Supreme Court cautioned against in *Gaines I*. Taking Plaintiff's allegations as true, as this Court must do on a 12(c) motion, Defendants have orchestrated a scheme to circumvent Plaintiff's shareholder rights by refusing to pay him a dividend despite being in a clear financial position to do so, and then, using section 55-6-40(j) as a sword, attempted to force Plaintiff to sell his shares for substantially less than fair value. While Plaintiff could have followed the process set out in section 55-6-40(j)(2) to seek appraisal of his shares, this Court nonetheless has the power, in accordance with *Gaines I*, to hear Plaintiff's allegations of minority shareholder oppression and determine the merits thereof.

48. Moreover, to the extent Defendants argue that Plaintiff has failed to allege a *Meiselman* claim, which requires Plaintiff to allege a *right* to receive a dividend, the

Court notes that *Meiselman* is more appropriately considered on a dissolution claim, not on a claim based on an alleged failure to act in good faith. *See High Point Bank & Tr. Co.*, 2010 NCBC LEXIS, at \*54 ("*Meiselman* has been the leading case for determining what rights or interests are protected under North Carolina's dissolution statute.").

49. While Plaintiff's Amended Complaint uses language from *Meiselman* by claiming a reasonable "expectation of receiving a large dividend," the Court believes Plaintiff should not be pigeon-holed into a *Meiselman* claim for this reason alone. Nowhere in the Amended Complaint does Plaintiff allege or argue that his Fourth claim is based solely on *Meiselman*. *Cf. Coleman v. Coleman*, 2015 NCBC LEXIS 114, at \*9−10 (N.C. Super. Ct. Dec. 10, 2015) (concluding that a "fair reading of the Complaint," where the plaintiff entitled his claim "Breach of Fiduciary Duty – *Meiselman* Action" did not put the defendants on fair notice of the plaintiff's intention to state a claim apart from the *Meiselman* line of cases). In fact, it was Defendants who first insinuated that Plaintiff was perhaps asserting a *Meiselman* claim. (Br. Supp. 8.) Therefore, rather than allowing Plaintiff the opportunity to amend his allegations to more fluently assert an equitable claim apart from *Meiselman*, as this Court did in *Coleman*, the Court finds that the breadth of Plaintiffs' allegations fairly put Defendants on notice of the contours of Plaintiff's Fourth claim.

50. The Court therefore concludes that Plaintiff has alleged sufficient facts to plead a claim for Defendants' failure to act in good faith by refusing to pay dividends.

Accordingly, the Motion as to Plaintiff's Fourth claim for Defendants' failure to act in good faith is DENIED.

**B.     Breach of Fiduciary Duty (Claim V)**

51.     Plaintiff's Fifth claim alleges that the Estate, as the majority shareholder of Johnston Properties, owes fiduciary duties to Plaintiff, a minority shareholder. (Compl. ¶ 85.)  Similarly, Plaintiff alleges that Gideon has been acting as an agent of the Estate, and therefore also owes fiduciary duties to Plaintiff.   (Compl. ¶ 87.) Plaintiff also alleges that Gideon owes fiduciary duties to Plaintiff in his capacity as director and chief executive officer of Johnston Properties.  (Compl. ¶ 86.)  Plaintiff further represents that the Estate and Gideon breached their fiduciary duties by "acting in bad faith in failing to arrange for payment of dividends" to Plaintiff and "in making the unfair stock redemption offers alleged." (Compl. ¶ 89.)

52.     With respect to the Estate, Defendants argue that Plaintiff has failed to show why not receiving a dividend is a breach of any fiduciary duty the Estate owes to Plaintiff. (Br. Supp. 10.)  With respect to Gideon, Defendants argue that Gideon does not owe any fiduciary duties to Plaintiff as a director or officer of the corporation, and rather, Gideon only owes duties to Johnston Properties.  (Br. Supp. 11–12.) Defendants argue that as a result, Plaintiff lacks standing to bring a breach of fiduciary duty claim against Gideon. (Br. Supp. 12.)  The Court addresses the Motion with respect to each Defendant in turn.

53.     First, the Court finds that Plaintiff has sufficiently alleged a claim for breach of fiduciary duty against the Estate.  A claim for breach of fiduciary duty has

three elements: (1) the existence of a fiduciary duty; (2) the breach of such a duty; and (3) that the plaintiff suffered damages as a result of the breach of duty. *See Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). Plaintiff alleged that (1) the Estate is a majority shareholder of Johnston Properties with fiduciary duties to its minority shareholders; (2) the Estate breached those duties by having Gideon, as its agent, refuse to pay Plaintiff dividends and then try to force Plaintiff to accept a redemption value far less than fair value; and (3) Plaintiff has been deprived of his shareholder interests and rights as a result of the Estate's actions.

54. Majority shareholders owe fiduciary duties to minority shareholders. *Gaines v. Long Mfg. Co. (Gaines II)*, 234 N.C. 340, 344, 67 S.E.2d 350, 353 (1951) ("The controlling majority of the stockholders of a corporation, while not trustees in a technical sense, have a real duty to protect the interests of the minority in the management of the corporation, especially where they undertake to run the corporation without giving the minority a voice therein."); *see also Loy v. Lorm Corp.*, 52 N.C. App. 428, 432, 278 S.E.2d 897, 901 (1981) ("[I]n North Carolina majority shareholders owe a fiduciary duty and obligation of good faith to minority shareholders as well as to the corporation."). Those duties include paying over to the minority shareholder his "just proportion of the income and of the proceeds of the corporate property." *Gaines II*, 234 N.C. at 344, 67 S.E.2d at 353. A fiduciary duty arises regardless of whether the majority shareholder is an individual or an entity acting through individuals.

55. Defendants admit that the Estate is the majority shareholder of Johnston Properties. (Answer ¶ 5.) Therefore, the Estate owes fiduciary duties to Plaintiff, a minority shareholder. Plaintiff alleges that the Estate breached the duty to cause the corporation to pay over to Plaintiff his "just proportion of the income and of the proceeds of the corporate property" in the form of a dividend despite the corporation's significant cash assets. The Court finds, therefore, that Plaintiff has pled sufficient facts to allege a breach of fiduciary duty by the Estate. Accordingly, the Motion, to the extent it seeks dismissal of this claim against the Estate, is DENIED.

56. The Motion also seeks dismissal of Plaintiff's claim for breach of fiduciary duty against Gideon on the basis that Plaintiff lacks standing to bring suit against Gideon as director of the corporation.

57. In North Carolina, "[s]hareholders . . . of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660, 488 S.E.2d 215, 220–21 (1997). Despite this general rule, there are two exceptions that permit a shareholder to recover for injuries to the corporation: "(1) where 'the wrongdoer owed [the shareholder] a special duty[,]' and (2) where the shareholder suffered a personal injury—one that is 'separate and distinct from the injury sustained by the other shareholders or the corporation itself.'" *Raymond James Capital Partners, L.P. v. Hayes*, 789 S.E.2d 695, 700 (N.C. App. 2016) (quoting *Barger*, 346 N.C. at 659, 488 S.E.2d at 219).

58. The first exception to the general rule permits a shareholder to bring a lawsuit directly against a corporate officer where the shareholder alleges the corporate officer owed a "special duty" to the shareholder plaintiff that is different than what is owed to the corporation itself. *Id.* at 701. *Barger* recognized that a special duty exists when a party violates its fiduciary duties to the shareholder. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220.

59. Defendants argue that "Plaintiff has failed to allege any special duty owed by Mr. Gideon to Plaintiff personally separate and distinct from the duties owed to [Johnston Properties] and has failed to allege any facts which, if taken as true, would support a special duty between Plaintiff and Mr. Gideon." (Br. Supp. 12.) However, Plaintiff alleges in his Amended Complaint that Gideon was operating as an agent of the Estate, which is the majority shareholder in Johnston Properties.

60. As noted above, majority shareholders owe fiduciary duties to minority shareholders. *Gaines II*, 234 N.C. at 344, 67 S.E.2d at 353. These duties reasonably extend to the agents of the majority shareholder. Taking Plaintiff's allegations as true, and for purposes of the Motion only, Gideon is an agent of the Estate. Thus, for the same reasons the Court finds that Plaintiff has sufficiently pled a claim for breach of fiduciary duty against the Estate, the Court finds that Plaintiff has sufficiently pled a claim against Gideon. Accordingly, the Motion is DENIED to the extent it seeks dismissal of Plaintiff's Fifth claim against Gideon as an agent of the Estate.

61. Additionally, our Court of Appeals' decision in *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 537 S.E.2d 248 (2000), supports Plaintiff's

ability to bring a direct claim for breach of fiduciary duty against Gideon as director and chief executive officer of Johnston Properties. In *Norman*, plaintiffs alleged that the defendants were acting in concert, owned a majority of the stock in the corporation, were officers of the corporation, and controlled the board of directors. *Id.* at 407, 537 S.E.2d at 260. Our Court of Appeals held that those allegations were sufficient to establish that the defendants owed the plaintiffs a "special duty" within the meaning of *Barger*. *Id.* This Court cautioned that *Norman* should not be extended beyond its facts. *Gao v. Sinova Specialties, Inc.*, 2016 NCBC LEXIS 104, at *19 (N.C. Super. Ct. Dec. 21, 2016) ("Norman should be considered in light of its particular facts and the Court of Appeals' recognition that applying the general rule that a corporate shareholder may not bring an individual action to the facts in that case would actually have 'disserved the corporation's interest which the general rule seeks to protect.'") (quoting *Blythe v. Bell*, 2013 NCBC LEXIS 17, at *14 (N.C. Super. Ct. Apr. 8, 2013)).

62. The facts alleged by Plaintiff are analogous to those in *Norman*. He has alleged that Gideon "is working in concert" with the other Defendants to force Plaintiff to give up his ownership interest in Johnston Properties; that Gideon has been given the Estate's power and control over the corporation and that Gideon controls the board; and that together, Gideon and the Estate own the rest of the shares in Johnston Properties. (Pl. Br. Opp'n Defs.' Mot. Dismiss & J. Pleadings 11 ["Pl. Br. Opp'n"].) Therefore, under the facts as set forth in the Amended Complaint, Plaintiff has properly alleged a direct claim against Gideon for breach of fiduciary

duty.[1]  Accordingly, the Motion, to the extent it seeks dismissal of Plaintiff's Fifth claim against Gideon as director of Johnston Properties, is also DENIED.

C.    Unfair and Deceptive Trade Practices (Claim VI)

63.    Plaintiff alleges that, because Defendants engaged in commerce in the State of North Carolina, and that their actions were "in and affecting commerce," Defendants' conduct falls under the Unfair and Deceptive Trade Practices Act ("UDTPA").  Defendants contend that this claim must be dismissed because this is a purely intra-business dispute to which the UDTPA does not apply.  In his response brief, Plaintiff concedes that the alleged conduct only concerns the internal operations of Johnston Properties, and asks the Court to allow him to withdraw the UDTP claim without prejudice.  (Pl. Br. Opp'n 13.)

64.    The UDTPA declares unlawful "unfair or deceptive acts or practices in or affecting commerce[.]"  N.C. Gen. Stat. § 75-1.1(a).  Our Supreme Court has stated, and this Court has reaffirmed, that section 75-1.1 does not apply to conduct "solely related to the internal operations of a business."  *White v. Thompson*, 364 N.C. 47, 51−52, 691 S.E.2d 676, 579 (2010); *Brewster v. Powell Bail Bondings, Inc.*, 2018 NCBC LEXIS 76, at *16−17 (N.C. Super. Ct. July 26, 2018) ("By now, the message should be clear: section 75-1.1 plays no role in resolving these internal corporate disputes.").

---

[1] Because the Court has found that the Fifth claim against Gideon survives on the analysis set forth above, it need not and does not determine whether it properly alleges a direct claim against Gideon based on Plaintiff's contention that he has suffered an injury that is "separate and distinct." *Barger*, 346 N.C. at 659, 488 S.E.2d at 219.

65.     Like in *Brewster*, each and every allegation in the Amended Complaint relates solely to the internal operations of Johnston Properties.  There is no basis for a UDTP claim under the facts alleged.  Therefore, Plaintiff fails to state a claim for UDTP and his Sixth claim is, accordingly, DISMISSED.

D.     Dissolution of Johnston Properties (Claim I)

66.     Plaintiff's First claim seeks judicial dissolution of Johnston Properties pursuant to N.C. Gen. Stat. § 55-14-30(2).  Plaintiff contends that dissolution of Johnston Properties is appropriate on two grounds.  First, Plaintiff contends that dissolution is reasonably necessary to protect his rights and interests as a minority shareholder in Johnston Properties.  *See* N.C. Gen. Stat. § 55-14-30(2)(ii).  Second, Plaintiff contends that Johnston Properties' assets are being misapplied and wasted. *See* N.C. Gen. Stat. § 55-14-30(2)(iv).  Defendants seek dismissal of this claim on both grounds, contending that Plaintiff has failed to allege how his shareholder rights have been violated or how Johnston Properties' assets have been misapplied or wasted.

**1.     Protection of Plaintiff's Shareholder Rights**

67.     Section 55-14-30(2)(ii) provides that the Court may dissolve a corporation if it establishes that "liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder."  N.C. Gen. Stat. § 55-14-30(2)(ii). Bringing a claim for dissolution pursuant to section 55-14-30(2)(ii) has become known as a *Meiselman* claim.  To successfully assert a *Meiselman* claim, a minority shareholder plaintiff must show that:

> (1) he had one or more substantial reasonable expectations
> known or assumed by the other participants; (2) the

expectation has been frustrated; (3) the frustration was without fault of plaintiff and was in large part beyond his control; and (4) under all of the circumstances of the case plaintiff is entitled to some form of equitable relief.

*Meiselman*, 309 N.C. at 301, 307 S.E.2d at 564.

68. With respect to the first *Meiselman* element, Plaintiff alleges that he had a reasonable expectation: (1) of receiving a dividend, based on Johnston Properties' past history of issuing dividends when it had significant cash assets, (Compl. ¶¶ 32, 80); (2) that his stock would not be diluted "by making an unprecedented issuance of stock to a new stockholder," (Compl. ¶ 80); and (3) that his stock would be redeemed at a fair price, consistent with the statutory language of N.C. Gen. Stat. § 55-6-40(j), (Compl. ¶ 34). (Pl. Br. Opp'n 5.)

69. With respect to the second *Meiselman* element, Plaintiff alleges that his reasonable expectations have been frustrated by Defendants' actions by: (1) refusing to issue a dividend to the shareholders, (Compl. ¶ 80); (2) by the Second Redemption Offer where Johnston Properties threatened to diminish the value of Plaintiff's stock by offering additional stock shares for sale to current directors of the company and "other related individuals," (Compl. ¶ 52); and (3) by offering a buy-back of Plaintiff's shares for significantly less than their fair value, (Compl. ¶¶ 34, 37). (Pl. Br. Opp'n 5.)

70. With respect to the third *Meiselman* element, Plaintiff alleges that he did nothing to frustrate his expectations of receiving a dividend or a fair redemption offer because he stopped working for Johnston Properties months before these issues arose. (Compl. ¶¶ 26, 34–39.) Moreover, he alleges that the purported misconduct

Defendants cite for setting-off the Redemption Offer is (1) unrelated to Defendants' refusal to pay him a dividend, and (2) involves "hotly contested issues of material fact." (Pl. Br. Opp'n 6.)

71. With respect to the fourth *Meiselman* element, Plaintiff alleges that Plaintiff has been frozen out of the company, "fiscally and physically" by Defendants' removal of him from his corporate position and his voting proxy and then refusing to pay him a dividend or offer a fair value for his shares. (Pl. Br. Opp'n 7) (quoting *Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 709, 520 S.E.2d 515, 521 (2000)).

72. These allegations, when taken as true, as they must be on a Rule 12(c) motion, are sufficient, if proven, to support dissolution under *Meiselman*. In *Meiselman*, the Supreme Court addressed the vulnerable position minority shareholders in a closely-held corporation can find themselves in when the personal relationships between majority and minority shareholders deteriorate. *Meiselman*, 309 N.C. at 290, 307 S.E.2d at 558 ("[W]hen the personal relationships among the participants break down, the majority shareholder, because of his greater voting power, is in a position to terminate the minority shareholder's employment and to exclude him from participation in management decisions."). Here, Plaintiff alleges precisely this type of deterioration in his relationship with the other shareholders and directors of Johnston Properties, and moreover alleges facts that support each of the *Meiselman* elements. *See Royals*, 137 N.C. App. at 704, 529 S.E.2d at 518; *see also Gao*, 2016 NCBC LEXIS 104, at *33. Therefore, the Court concludes that the

above allegations are sufficient to allege a claim for dissolution under section 55-14-30(2)(ii).

## 2. Misapplication or Waste of Corporate Assets

73. Section 55-14-30(2)(iv) provides that a court may dissolve a corporation if it is established that "the corporate assets are being misapplied or wasted." N.C. Gen. Stat. § 55-14-30(2)(iv). There is little direct law in North Carolina defining corporate waste. However, our courts frequently turn to Delaware law for guidance on matters of corporate law where North Carolina appellate decisions provide little guidance. *First Union Corp. v. Suntrust Banks, Inc.*, 2001 NCBC LEXIS 7, at *31 (N.C. Super. Ct. Aug. 10, 2001). In Delaware, "waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Krieger v. Johnson*, 2014 NCBC LEXIS 13, at *21 (N.C. Super. Ct. Apr. 30, 2014).

74. Plaintiff alleges that Johnston Properties paid Gideon a bonus, in the form of stock, representing approximately 1.5% of the outstanding stock in Johnston Properties, "as compensation for managing and selling Johnston Properties' real estate assets." (Compl. ¶ 31.) Plaintiff contends that Gideon engaged in "gross mismanagement of Johnston Properties by, among other things, selling a majority of its real estate holdings without trying to reduce the Company's tax exposure, thereby depleting the assets of the Company." (Compl. ¶ 59.) Plaintiff also alleges that Johnston Properties' one remaining employee's duties are to "repair and focus on Karen Lang Johnston's personally owned property[,] " (Compl. ¶ 58), and therefore

company funds are being used to maintain non-company owned property. Accordingly, Plaintiff alleges that Johnston Properties' "remaining cash will be improperly depleted" by (1) payments to Gideon, (2) payments to the remaining employee, and (3) payment of taxes relating to the sale of the remaining properties. (Compl. ¶ 63.)

75. "American courts traditionally have been reluctant to interfere in the internal affairs of corporations." *Meiselman*, 309 N.C. at 291−92, 307 S.E.2d at 559. "'Justifying liquidation as a tool for enforcing the rights or interests of a complaining shareholder . . . requires a strong showing' because '[t]he statutory right to judicial dissolution . . . [is] counter to the judiciary's traditional deference . . . to the business judgment rule.'" *Brady v. Van Vlaanderen*, 2017 NCBC LEXIS 61, at *26 (N.C. Super. Ct. Jul. 19, 2017) (quoting *High Point Bank & Tr. Co.*, 2010 NCBC LEXIS 14, at *19). "The business judgment rule provides an initial evidentiary presumption that a director acted with due care and in the corporation's best interest." *Coleman*, 2015 NCBC LEXIS 114, at *18. In order to defeat this presumption and survive a judgment on the pleadings, Plaintiff must allege mismanagement in more than conclusory terms. *See id.* "Generally, an adequate pleading will include allegations that the director (1) failed to act in good faith; (2) made a decision that was unreasonable under the circumstances; or (3) was inattentive or uninformed." *Maurer v. Maurer*, 2013 NCBC LEXIS 44, at *16−17 (N.C. Super. Ct. Aug. 23, 2013).

76. At this early stage of litigation, when Plaintiff has not had the benefit of discovery and has been allegedly denied his shareholder rights to inspect and copy

corporate records, the Court finds that Plaintiff has alleged sufficient facts to show self-dealing and unreasonable actions undertaken by Gideon. *See id.* at \*17−18 (concluding that the "liberal rules demanded by Rule 12(b)(6)," a standard akin to Rule 12(c), warranted a finding that the complaint's allegations were "adequate to withstand a present dismissal through early application of the business judgment rule"). This Court's determination, of course, is without prejudice to revisiting the business judgment rule at a later stage in the litigation. Moreover, to the extent that Defendants argue that Plaintiff's allegations here are "claims by the Company against Mr. Gideon [which] . . . Plaintiff lacks standing to bring[,]" (Br. Supp. 14−15), the Court is unpersuaded. Plaintiff alleges these facts in support of his dissolution claim on the grounds of corporate waste and misapplication of corporate assets. It is squarely within a shareholder's rights to bring a dissolution claim on those grounds. *See* N.C. Gen. Stat. § 55-14-30(2). Accordingly, the Court concludes that Plaintiff has sufficiently alleged a claim for dissolution under section 55-14-30(2)(iv).

77.     In sum, the Court concludes that Plaintiff has sufficiently stated a claim for judicial dissolution under N.C. Gen. Stat. § 55-14-30(2)(ii) and (iv), and accordingly the Motion is DENIED with respect to Plaintiff's First claim.

E.     <u>Appointment of Receiver (Claims II & III)</u>

78.     Plaintiff seeks appointment of a receiver to take possession of and preserve Johnston Properties' assets pursuant to both section 55-14-32 and section 1-502(1) of the North Carolina General Statutes. (Compl. ¶¶ 70−75.) Plaintiff asserts receivership as his Second and Third "claim[s] for relief." (Compl. ¶ 70, 73.) The

Court notes that appointment of receiver pursuant to both section 55-14-32 and section 1-502(1) are *remedies*, not claims. *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *29 (N.C. Super. Ct. Oct. 2, 2017.) Therefore, the Court DISMISSES Plaintiff's Second and Third claims for the reason that they are not independent claims for relief.

79. However, section 55-14-32 and section 1-502(1) give the court discretion whether or not to appoint a receiver, either to protect shareholder rights or to wind up and manage an orderly dissolution of a corporation. *See Barnes v. Kochhar*, 178 N.C. App. 489, 500, 633 S.E.2d 474, 481 (2006). Therefore, as with all other remedies, when an underlying independent claim such as dissolution is alleged, a plaintiff may be entitled to the appointment of a receiver as a remedy. Plaintiff has separately asked the Court, in his prayer for relief, for a receiver to be appointed. Therefore, Plaintiff may still seek, as he has already done so, (ECF No. 29), appointment of a receiver by motion or otherwise.[2]

## VI.    CONCLUSION

80. For the foregoing reasons, the Court hereby **DENIES** as untimely the Motion to the extent it is brought pursuant to Rule 12(b)(6). The Court **DENIES in part** and **GRANTS in part** the Motion on Rule 12(c) grounds, dismissing Plaintiff's receivership (Second and Third) claims and Plaintiff's UDTP (Sixth) claim but denying Defendants' request for dismissal as to the remaining claims.

---

[2] In reaching this conclusion, the Court makes no finding with respect to whether or not Plaintiff is entitled to the appointment of a receiver.

**SO ORDERED**, this the 15th day of November, 2018.



/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases